UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
VIVIANA LOPEZ,
                                   :
                 Plaintiff,
                                   :    **REPORT AND RECOMMENDATION**
         -against-
                                   :    05 Civ. 10635 (JSR)(MHD)
JO ANNE B. BARNHART,
Commissioner of Social Security,   :

                 Defendant.        :
----------------------------------x

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**


        Plaintiff Viviana Lopez commenced this action pursuant to
the Social Security Act, 42 U.S.C. § 405(g), to challenge the
decision of the Commissioner of the Social Security
Administration (the "Commissioner" and the "SSA," respectively)
denying her application for Supplemental Security Income ("SSI")
benefits. Defendant has moved for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.
Plaintiff seeks an order (1) reversing the Commissioner's
determination that she was not disabled and (2) awarding her
benefits retroactive to January 2003 or, in the alternative,
remanding the case for reconsideration. For the reasons set
forth below, we recommend that the Commissioner's motion be
denied and the case remanded for further consideration.

## PROCEDURAL HISTORY

On September 23, 2003, plaintiff protectively filed an application for SSI benefits, alleging that she had become disabled on January 1, 2003 as a result of depression. (Tr. 17, 27, 35, 41-43). The SSA denied her application on January 26, 2004. (Tr. 28-31). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 34). The ALJ, Newton Greenberg, considered the matter de novo at a hearing held on April 29, 2005. (Tr. 17, 23, 277-93). Plaintiff, who was represented by counsel, appeared and testified. (Tr. 279-93). On May 10, 2005, the ALJ found that plaintiff was not disabled. (Tr. 17-22). Plaintiff appealed the decision on September 9, 2005, submitting additional evidence for consideration. (Tr. 203, 251). The SSA Office of Hearings and Appeals denied plaintiff's request for review on October 13, 2005. (Tr. 4-6).

Plaintiff then filed suit in this Court on December 19, 2005. She alleges that: 1) the ALJ's determination that she was not disabled was arbitrary, capricious, and not supported by substantial medical evidence; 2) the ALJ failed to properly assess the medical evidence and improperly disregarded the opinions of plaintiff's treating physicians; and 3) the ALJ did not meet his duty to develop the administrative record. (Compl.

¶¶ 9-12). Plaintiff seeks an order reversing the Commissioner's decision and awarding her benefits retroactive to January 1, 2003 or, alternatively, an order remanding the case for reconsideration.

The Commissioner responds that the determination that plaintiff is not disabled was supported by substantial evidence, and that the ALJ's analysis complied with SSA regulations. She therefore moves for judgment on the pleadings.

**FACTUAL BACKGROUND**

I. Non-Medical Evidence

Plaintiff Viviana Lopez was born in the Dominican Republic on February 2, 1962. (Tr. 35, 106). She attended school in Santo Domingo, where she completed the sixth grade in 1978. (Tr. 48-49, 280). She has received no other education or formal training. (Tr. 49). She is unable to speak or read English, and has required an interpreter in her dealings with the Social Security Administration. (See, e.g., Tr. 44, 279).

Plaintiff came to the United States in 1981. (Tr. 35, 280). She worked in a factory, but left her job in June 1984 to care

for her daughter, who suffers from Down Syndrome.[1] (Tr. 45, 282-83). She has not been employed since. (Tr. 282-83).

Plaintiff lives in an apartment with her husband and three children, who are ages 25, 21, and 19, respectively. (Tr. 53, 86, 106). She reported anxiety, depression, insomnia, and difficulty concentrating. (Tr. 51, 56-60, 68, 75-76, 107). She stated that her family must remind her to take her medicine and perform other routine tasks. (Tr. 51, 55, 60, 290). She reported sleeping an average of four hours per night, and having difficulty getting out of bed in the mornings. (Tr. 51, 54, 284, 291). She also testified that she has difficulty preparing food and performing household chores. (Tr. 51, 56, 291-92). While she still prepares her children for school, cooks meals, and cleans, she reported that these tasks take her longer to complete than they used to. (Tr. 54-55). Her youngest daughter, Diana, assists with the household chores and the care of her older sister after school and on the weekends. (Tr. 56, 152-53, 284, 291-92). Diana

---

[1] Ms. Lopez's precise employment history is unclear from the record. Her Disability Report indicates that she worked only from January to June of 1984 packaging clothing in a factory. (Tr. 45-46). However, the file also indicates that she was employed in some fashion from 1981 to 1984. (Tr. 33). A brief submitted by her lawyer to the ALJ indicates that she worked from 1981 to 1983 packaging clothing in a factory, and from 1983 to 1984 as a packer in a candy factory. (Tr. 106). Plaintiff confirmed in her testimony at the administrative hearing that she had not worked since 1984. (Tr. 282-83).

submitted a letter describing her mother as "mentally fragile" and prone to anxiety attacks. (Tr. 152).

Plaintiff also reported that she attends church regularly, and that members of her congregation take her out for rides. (Tr. 283-84). She estimated that she goes out with members of her congregation between two and five times per week, depending on how she feels. The members take her with them when they go preaching, or take her shopping or to McDonald's. (Tr. 285-87; see also Tr. 153).

## II. Medical Evidence

### A. Treating Physicians

Plaintiff underwent a hysterectomy on January 3, 2003. (Tr. 74, 87). On February 26, 2003, she sought emergency room treatment for depression and anxiety, which she reported had begun after a fire occurred in her apartment building. (Tr. 74-75). She complained of anxiety, sleeplessness, loss of appetite, low energy, and a lack of concentration. (Tr. 75). A physician observed that she was "crying but calm" and diagnosed mild depression. (Tr. 75-76).

Over the next few weeks, the hospital's Mobile Crisis Service ("MCS") conducted follow-up assessments of plaintiff, who appears to have been diagnosed with Post-Traumatic Stress Disorder ("PTSD"). (Tr. 69-70). During this time, plaintiff reported being depressed and anxious. (Tr. 67). She was placed on Zyprexa and Lexapro (Tr. 67, 69-70),[2] and reported improvement during her assessment on May 2, 2003. (Tr. 70). MCS staff noted on that date that plaintiff was well-groomed and cooperative, and that she had reported that she was getting ready to go out and meet some friends. (Id.). When the hospital followed up by phone on May 12, plaintiff reported feeling better, but was "a little nervous during the day." (Tr. 72). By May 16, plaintiff was reported to be in remission and currently stable, and MCS closed her case. (Tr. 69).

On May 27, 2003, plaintiff returned to the hospital for emergency psychiatric treatment. (Tr. 143). She again reported heightened anxiety, depressed mood, weight loss, and sleeping problems, and said she had been experiencing these symptoms since her hysterectomy in January 2003. (Id.). She had also switched medications on May 24, and reported increased anxiety

---

[2] Zyprexa is used to treat schizophrenia and bipolar disorder, and Lexapro is used to treat depression and anxiety. See Zyprexa Home Page, http://www.zyprexa.com; Lexapro Home Page, http://www.lexapro.com.

as a result. (Id.). The psychiatrist noted that plaintiff seemed slightly downcast, with a "blunted" mood and poor eye contact. (Tr. 144). He indicated the possibility of PTSD or Bipolar Disorder. (Tr. 146).

MCS conducted another assessment of plaintiff on May 28, 2003. (Tr. 68). Plaintiff reported experiencing depression, sleeplessness, loss of appetite, low energy and motivation, and hopelessness. (Id.). MCS conducted a follow-up assessment the next day, documenting similar symptoms, and noting as well that plaintiff expressed a recurrent fear of dying. (Tr. 67). MCS also observed that plaintiff was friendly and polite, even though she reported feeling depressed and nervous. (Id.). Plaintiff was prescribed Paxil and Trazodone. (Id.).[3]

Plaintiff was referred to the Nagle Clinic for further treatment beginning June 2, 2003. (Tr. 71, 87). In her intake appointment, plaintiff indicated that she felt depressed, sad, and afraid most of the time, but that she felt better when doing household chores. (Tr. 87). The clinic also provided a referral to Dr. Peter Ruiz, who met with plaintiff on June 9, 2003, and

---

[3] Paxil is used to treat depression, anxiety, and PTSD, and Trazodone is used to relieve symptoms of depression. See Paxil Home Page, http://www.paxil.com; Trazodone Home Page, http://www.trazodone.com.

diagnosed Major Depressive Disorder, Single Episode, Moderate. (Tr. 86).[4]  Dr. Ruiz noted that since plaintiff's hysterectomy, she had been "insomniac, anxious, and extremely fearful of everyday events," and that her symptoms included anxious mood, poor appetite, and excessive anxiety. (Id.). He also noted that plaintiff found good support through her church, related well, and did not have impaired judgment. (Id.).

In June 2003, plaintiff traveled to the Dominican Republic, where she was hospitalized for depression from June 30 to July 9, 2003. (Tr. 139). During this time, she was reported to have exhibited suicidal tendencies and panic attacks. (Id.). After her release on July 9, plaintiff was readmitted on August 16, 2003 because her symptoms had not completely subsided. (Tr. 140). She stayed until August 23, 2003, undergoing four sessions of electro-convulsive therapy. (Id.). Her treating physician, Dr. Lillian Carrasco, indicated that plaintiff had a family history of mood disorders, exhibited poor impulse control, and had a high risk of suicide. (Tr. 139-41). Dr. Carrasco diagnosed Major Depressive Disorder and treated plaintiff with Clonazepam, Citalopram, and Lamotrigine. (Tr. 139-40).[5]

---

[4] An MCS assessment completed on May 29, 2003 indicates that Dr. Ruiz had treated plaintiff as early as February 2003. (Tr. 67).
[5] Clonazepam, Citalopram, and Lamotrigine are used to treat anxiety, depression, and bipolar disorder, respectively. See

After returning to the United States, plaintiff continued to meet periodically with Dr. Ruiz. On November 10, 2003, Dr. Ruiz noted that plaintiff's mood was neutral and that she related well. (Tr. 84). In a psychiatric assessment completed on June 7, 2004, Dr. Ruiz described plaintiff's history of panic attacks, anxiety, and depression. (Tr. 124-27). He also noted a "long history of domestic violence." (Tr. 126). Dr. Ruiz diagnosed Major Depressive Disorder, Single Episode, Severe, with a panic disorder. (Tr. 127). He also indicated that plaintiff exhibited no psychosis, no suicidal ideation, and no impaired judgment. (Id.). At a follow-up appointment on July 26, 2004, Dr. Ruiz documented having discussed with plaintiff the importance of medication compliance, but he did not indicate any major changes in plaintiff's condition. (Tr. 132). Both the June and July records described plaintiff as "well related," with no impaired judgment. (Tr. 127, 132).

On October 18, 2004, Dr. Ruiz observed that plaintiff had been non-compliant with her medication and was suffering from low motivation, low energy, and poor concentration. (Tr. 131).

---

Clonazepam, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a682279.html (last visited Apr. 3, 2007); Citalopram, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699001. html (last visited Apr. 3, 2007); Lamictal Home Page, http:// www.lamictal.com.

On March 28, 2005, Dr. Ruiz again noted that plaintiff was non-compliant with her medication and that she was anxious but related well. (Tr. 130). On April 25, 2005, Dr. Ruiz noted that plaintiff was complying with her medication regimen but experiencing melancholic symptoms, such as feeling depressed when it rained or on certain days of the week. (Tr. 129). He also indicated again that plaintiff exhibited no suicidal ideation, no psychosis, and no impaired judgment. (Id.).

During this time, plaintiff also participated in group therapy sessions led by her social worker, Ms. Oneida Brown. (Tr. 262). Ms. Brown wrote a letter describing the treatment relationship and noted that "there ha[d] not been any symptom reduction related to [plaintiff's] depression" as of April 25, 2005. (Tr. 150).

Dr. Ruiz completed a Functional Capacity Questionnaire on April 25, 2005.[6] In it, he indicated that he was seeing plaintiff once every six to eight weeks, and diagnosed her with Major Depressive Disorder, Severe. (Tr. 115). Although he indicated that plaintiff experienced episodes of severe anxiety (Tr. 117), and that she had suffered at least three episodes of

---

[6] The Functional Capacity Questionnaire is an SSA form used to assess a patient's possible entitlement to SSI disability benefits. (Tr. 115).

deterioration or decompensation (Tr. 119), his prognosis was "fair." (Tr. 117).

Responding to a section of the form requesting "all clinical findings and test findings" and the "results of a current mental status examination," Dr. Ruiz's notes included "casually dressed," "neutral/anxious mood," "no overt psychosis," "alert," and "judgment not impaired." (Tr. 116). He noted mild to moderate restrictions[7] on plaintiff's daily activities, as well as moderate difficulties in maintaining social functioning and task completion. (Tr. 118-19). He observed, however, that plaintiff "continues to be very active in church activities" (Tr. 121), continues to care for her daughter with Down Syndrome, and is not completely unable to function independently outside the home. (Tr. 120).

Finally, Dr. Ruiz indicated moderate to marked limitations in plaintiff's abilities to function well in a work setting on a regular and continuous basis. (Tr. 121). Specifically, Dr. Ruiz noted moderate limitations in plaintiff's ability to understand,

---

[7] The Functional Capacity Questionnaire defines a "mild" impairment as "one which has a slight effect upon the ability to function," a "moderate" impairment as "one which affects, but does not preclude, the ability to function," and a "marked" impairment as one that "seriously affects the ability to function." (Tr. 119).

remember, and carry out instructions; respond appropriately to supervision; and respond appropriately to co-workers. (Tr. 121). He noted marked limitations in plaintiff's ability to satisfy an employer's normal quality, production, and attendance standards; respond to customary work pressures; and perform complex tasks on a sustained basis in a full-time work setting. (Id.).

After the unfavorable decision of the ALJ, Dr. Ruiz supplemented this questionnaire with a letter dated September 9, 2005, in which he attempted to clarify any perceived inconsistencies in his treatment notes. (Tr. 251). In his letter, Dr. Ruiz described his experience in the field of psychiatry and the length of his treatment relationship with plaintiff. (Id.). He reiterated his diagnosis of Major Depressive Disorder and stated that plaintiff also experiences "episodes of panic attacks and other symptoms," including anxiety, crying bouts, anhedonia,[8] and insomnia. (Id.). He explained that the nature of plaintiff's disorder is such that her "symptoms are on some occasions more acute than others" and that her repeated episodes of decompensation[9] had "severely

---

[8] "Anhedonia" is defined as a "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Medical Dictionary 83 (28th ed. 1994) [hereinafter Dorland's].
[9] "Decompensation" is defined as the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's, supra, at 432.

limited her ability to 'function' and work." (Id.). He indicated that plaintiff's condition "may affect her every day life and ability to function in a variety of settings," and that plaintiff is "unable to maintain the consistent attendance and performance required for active employment at this time." (Id.).

## B. Consulting Physicians

Plaintiff was also evaluated by an SSA consulting physician, Dr. Richard King, on October 29, 2003. (Tr. 89-90). Based on a single session with plaintiff, Dr. King reported that she was well-groomed, coherent, and not significantly depressed or anxious, showed adequate attention and concentration, and exhibited a friendly and appropriate affect. Although he acknowledged that she had traveled to her appointment with a friend because "she gets nervous," Dr. King reported that plaintiff was able to perform "routine activities of daily living," such as household chores and shopping, and that she attended church and read the Bible. (Tr. 89). According to Dr. King, plaintiff indicated no history of psychiatric hospitalization or suicidal behavior. (Id.). Dr. King concluded that plaintiff was mildly depressed but able to carry out

instructions and respond appropriately to supervision and work pressures in a work setting. (Tr. 90).[10]

On January 20, 2004, a consulting physician, Dr. Richard Nobel, prepared a psychiatric review for the purpose of making a disability determination. (Tr. 91-104). The sparse report indicated that plaintiff had a medically determinable impairment, which Dr. Nobel diagnosed as Adjustment Disorder, mild. (Tr. 94). Finding that this impairment was not severe (Tr. 91), Dr. Nobel concluded that plaintiff was not disabled. (Tr. 27). In offering this conclusion, Dr. Nobel did not identify the symptoms that underlay his diagnosis and failed to address that part of the form that asked for specifics with regard to functional limitations. (See Tr. 94, 101, 103).

III. Administrative Proceedings

    A. Plaintiff's Testimony on April 29, 2005

Plaintiff appeared with legal representation for a hearing before ALJ Newton Greenberg on April 29, 2005. (Tr. 277-93). The ALJ asked plaintiff whether she had had any psychiatric

---

[10] We infer from Dr. King's report that he did not have a complete set of plaintiff's medical records since he did not refer to plaintiff's hospitalization in the Dominican Republic.

hospitalizations, and plaintiff responded that she had been hospitalized in Santo Domingo in 2003 because of depression. (Tr. 280). She also stated that she had gone to Santo Domingo because her treatments in New York did not seem to be working, and she had wanted to find out why. (Tr. 281). After inquiring about plaintiff's family and living situation, the ALJ asked her about her work history, and plaintiff explained that she had stopped working in 1984 when her daughter was born with Down Syndrome. (Tr. 282-83). The ALJ asked why plaintiff could not hold down a job today, and she responded that she did not feel well enough because of her depression. (Tr. 283). When asked for clarification, plaintiff stated that she felt "down," very nervous, and as if she had no strength. (Id.). She complained of pain in her legs and explained that she sometimes could not get out of bed. (Id.). The ALJ then questioned plaintiff about her church activities, and plaintiff responded that she attends church and reads the Bible regularly. (Id.).

When the ALJ asked plaintiff to describe her typical day, plaintiff stated that she gets up at six o'clock to get her daughter ready for school but needs help getting up, and that her daughter sometimes misses school when plaintiff cannot get out of bed. (Tr. 284). Plaintiff stated that she returns to bed after her daughter leaves for school in an attempt to "feel more

relaxed." (Id.). When the ALJ asked what plaintiff did while her daughter was at school, plaintiff responded that she goes out with members of her congregation or with relatives to distract her mind and because she is afraid of being alone. (Tr. 284-86).

Plaintiff's attorney then asked plaintiff about her hospitalization in the Dominican Republic (Tr. 287), but plaintiff stated that she could not recall the details of her hospitalization because she had been "in really bad shape." (Tr. 288). She did remember receiving "a lot of therapy" and having "a lot of gadgets all over my body." (Tr. 288). She stated that she had had suicidal thoughts at that time and had received medication that was somewhat helpful. (Id.).

Plaintiff also testified about a fire in her building. (Id.). She reported that it had occurred in the apartment next to hers, that she had been required to evacuate, and that three apartments had been destroyed. (Id.). According to plaintiff, the fire made her very nervous and put her in a "panic state." (Tr. 289). She stated that she slept fully clothed and made her children do the same out of fear that the fire would come back, and that she constantly got up at night "checking to look for something that was going to ignite." (Id.).

16

Plaintiff provided additional testimony about the nature of her condition. When questioned about the side effects of her medications, plaintiff responded that they caused memory loss. (Tr. 290). She stated that her children had to help her remember where she put things, and that her doctor had to call her on the days of her appointments so that she would not miss them. (Id.). Plaintiff also mentioned having female cousins who had depression. (Id.). Plaintiff then testified that she felt weak and nervous, that she had frequent headaches, that her hands and feet trembled "on the inside," and that she slept about four hours a night. (Tr. 290-91). She stated that she was afraid to be indoors and felt unable to do household chores. (Tr. 291). Finally, she reported that her symptoms started around the time of her hysterectomy. (Tr. 292).


B. The ALJ's Decision


The ALJ issued a decision on May 10, 2005. He first found that plaintiff had not engaged in substantial gainful activity since she had filed her application and then concluded that while plaintiff's impairment was severe, it was not as severe as any impairment listed in Appendix 1, Subpart P to Regulation 4.[11]

---

[11] If a claimant has a "listed" impairment, she will be considered disabled without an additional assessment of

(Tr. 18, 21). The ALJ further found that plaintiff's testimony was "not fully credible," and that her symptoms were "not of such severity, persistence, or intensity as to preclude all work activity." (Tr. 20-21). He found that plaintiff is a younger individual, has a sixth-grade education, cannot communicate in English, and had not had any relevant work in the prior fifteen years. (Tr. 21). The ALJ then determined that plaintiff was able to "perform a full exertional range of work and . . . unskilled work requiring simple instructions" and was not disabled under the Social Security Act. (Id.).

In making these findings, the ALJ concluded that the opinion of plaintiff's treating physician, Dr. Ruiz, was not entitled to controlling weight because it was inconsistent with Dr. Ruiz's treatment notes.[12] (Tr. 20). The ALJ also found that the two-page report of the consulting physician, Dr. King, was "[t]he most detailed mental status examination" available.[13]

---

vocational factors such as age, education, and work experience. If the claimant does not have a listed impairment, the Commissioner must consider whether the claimant still has the capacity to perform work. See, e.g., Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

[12] The ALJ did not at that time have the benefit of Dr. Ruiz's letter of September 9, 2005. (See Tr. 251).

[13] The ALJ did not comment upon the fact that the consulting physician was not fully informed of plaintiff's psychiatric history at the time that he made his report, as Dr. King was unaware of plaintiff's hospitalization and suicidal ideation. (See Tr. 20, 89).

(Id.). While the ALJ acknowledged plaintiff's treatment by the Mobile Crisis Service in May 2003, her hospitalizations in the summer of 2003, and her participation in group therapy throughout 2003 and 2004 (Tr. 18), he concluded that her most serious symptoms were under control before she filed her SSI application in September 2003. (Tr. 20).

### C. The Appeals Council Decision

Plaintiff sought review by the Appeals Council. (Tr. 10, 203). When doing so, she supplemented the record with the letter from Dr. Ruiz, who addressed the perceived inconsistencies between his treatment notes and his medical opinion. (Tr. 251; see Pl.'s Mem. 8-9). The Appeals Council denied plaintiff's request for review without discussion of the merits. (Tr. 4).

## ANALYSIS

### I. Standard of Review

When a claimant challenges the SSA's denial of benefits, the court may set aside the ALJ's decision only if it was based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial

evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006). The substantial-evidence test applies not only to the Commissioner's factual findings but also to the inferences and conclusions of law to be drawn from such facts. See Caraballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). To determine whether substantial evidence exists, the reviewing court must examine the entire record, including any contradictory evidence. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

It is the province of the SSA, not the courts, to weigh the conflicting evidence in the record. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). While the ALJ need not resolve every conflict in the record, see Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.

1999) (explaining that the Commissioner must give reasons for the particular disposition of a claim).

If the court finds a lack of substantial evidence for the Commissioner's findings or other legal error, it has two options. If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court will remand the case for further development of the evidence. See, e.g., Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); see also Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004); Rosa, 168 F.3d at 83.

## II. Proof of Disability

To establish disability under the Social Security Act, a claimant must demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

21

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute additionally requires that the claimant's impairment be

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 423(d)(2)(A).

In making a determination as to an SSI claimant's disability, the Commissioner is required to apply the five-step process set forth in 20 C.F.R. § 416.920. The Second Circuit has described this process as follows:

> *First,* the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary *next* considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the *third* inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the *fourth* inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. *Finally,* if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

Bush, 94 F.3d at 44-45 (citations omitted).


   If the claimant suffers from a mental impairment, SSA
regulations require the ALJ to use a "special technique" in
employing the five-step process delineated in § 416.920. 20
C.F.R. § 416.920a(a); see also Pabon v. Barnhart, 273 F. Supp.
2d 506, 513 (S.D.N.Y. 2003). The ALJ must first determine
whether the claimant has a medically determinable impairment; if
so, the ALJ must rate the degree of the claimant's functional
limitation from the impairment in order to determine the
impairment's severity. § 416.920a(b)-(d). The ALJ must rate the
degree of limitation in "four broad functional areas," which are
"[a]ctivities of daily living; social functioning;
concentration, persistence, or pace; and episodes of
decompensation." § 416.920a(c)(3). If the degree of limitation
in these areas indicates that the impairment is severe, the ALJ
must then determine whether the claimant has a listed mental
disorder. See § 416.920a(d)(2). If the impairment is not one of
the listed disorders, the ALJ assesses the claimant's residual
functioning capacity, § 416.920a(d)(3), which is used to
determine whether the claimant can perform her past work or
other work. § 416.920(e). If the mentally impaired claimant
cannot perform such work, "the final consideration is whether
the [claimant] can be expected to perform unskilled work."

Program Policy Statement No. 119 (SSR 85-15), 1985 WL 56857, at *4 (1985).

The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the last step, and thus must demonstrate the existence of jobs in the economy that the claimant can perform. See, e.g., Kamerling v. Massanari, 295 F.3d 206, 210 (2d Cir. 2002). When employing this five-step analysis, the Commissioner must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown, 174 F.3d at 62 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

Finally, the Commissioner must give special consideration to the findings of a claimant's treating physician. A treating physician's opinion is controlling if it is "well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see 20 C.F.R. § 416.927(d)(2). The more consistent a treating physician's opinion is with other evidence in the record, the more weight it will be accorded. § 416.927(d)(4).

III. Assessment of the Motion

Applying the required five-step framework to plaintiff, the ALJ found that (1) plaintiff was not engaged in substantial gainful activity; (2) plaintiff had a severe medical impairment; (3) her impairment was not one of the listed impairments; (4) plaintiff did not have any past relevant work; and (5) she retained the residual functional capacity to engage in a full exertional range of work and unskilled work requiring simple instructions. (Tr. 21). The ALJ concluded that this residual functional capacity, in combination with plaintiff's age of forty-three years and her education through the sixth grade, dictated that she was "not disabled." (Id.).

Plaintiff launches several challenges to the ALJ's conclusion that she was not entitled to benefits. She argues that the disability determination is contrary to substantial evidence in the record because the ALJ (and the Commissioner) ignored or misconstrued substantial medical evidence, including the cumulative weight of the medical evidence, the assessment of her treating physician, and the assessments of two other treating sources. Plaintiff also argues that the ALJ did not adequately develop the administrative record and that he misapplied the treating-physician rule.

25

We first consider the ALJ's assessment of Dr. Ruiz's findings and whether the ALJ properly applied the treating-physician rule. Next, we consider whether the ALJ had a further duty to develop the record after concluding that Dr. Ruiz's report was inconsistent with his own treatment notes. We then turn to plaintiff's contention that the ALJ failed to consider the opinions of Dr. Carrasco and Ms. Brown, who plaintiff contends should also have been regarded as treating sources. Finally, we address the question of the appropriate remedy.

A.   The ALJ's Assessment of Dr. Ruiz's Findings

1. Treating-Physician Rule

The key to the ALJ's recommended denial of plaintiff's benefits application was his determination that plaintiff was capable of performing unskilled work requiring simple instructions. To reach that result, the ALJ was effectively required to reject the opinion of plaintiff's treating physician, Dr. Ruiz, who in substance found that plaintiff could not do such work because she had marked limitations in her ability to function in a work setting.

Under the Commissioner's regulations, the opinion of a claimant's treating physician is generally given "more weight." 20 C.F.R. § 416.927(d)(2); see also Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (explaining that the regulations give deference to treating physicians' opinions because "opinions based on a patient-physician relationship are more reliable than opinions based . . . solely on an examination for purposes of the disability proceedings themselves"). In addition, if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it must be given controlling weight. § 416.927(d)(2). When the treating physician's opinion is not given controlling weight, the ALJ must consider a set of factors in determining the weight that the opinion should be given. These factors are (1) the duration of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) how much the physician has supported the opinion with evidence and explanation, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the physician, and (6) other factors tending to support or contradict the opinion, such as the physician's familiarity with the claimant's case record. § 416.927(d)(2)-(6); see also, e.g., Shaw, 221 F.3d at 134 (citing Clark, 143

27

F.3d at 118). Finally, the ALJ cannot "substitute his own expertise or view of the medical proof for the treating physician's opinion." <u>Shaw</u>, 221 F.3d at 134.

In the functional-capacity questionnaire, Dr. Ruiz diagnosed plaintiff with a Major Depressive Disorder. (Tr. 115). He noted that plaintiff repeatedly experienced episodes of deterioration or decompensation that would cause her to withdraw or would cause her symptoms to be exacerbated. (Tr. 119). He further determined that plaintiff had "marked" limitations in (1) her ability to respond to customary work pressures and (2) her ability to satisfy normal quality, production, and attendance standards. (Tr. 121).

If Dr. Ruiz's opinion had been given controlling weight, it plainly would have led to a finding of disability because it indicated that plaintiff is unable to meet the demands of unskilled work. As the SSA has explained, unskilled work requires "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Program Policy Statement No. 119 (SSR 85-15), 1985 WL 56857, at *4 (1985). Thus, even a person whose vocational factors of age,

Case 1:05-cv-10635-JSR-MHD   Document 15   Filed 05/01/07   Page 29 of 46


education, and work experience "would ordinarily be considered favorable" should be considered disabled if "she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations." Id. According to Dr. Ruiz, plaintiff would fall in this category.

The ALJ did not give controlling weight to Dr. Ruiz's opinion as stated in the questionnaire, and instead gave "more weight to the findings of Dr. King," the consulting physician. In doing so, the ALJ cited "Dr. Ruiz's inconsistencies, the fairly mild symptoms noted in his treatment notes, and the more detailed examination findings by Dr. King." (Tr. 20). Specifically, the ALJ pointed to Dr. Ruiz's notes indicating that plaintiff related well and had good eye contact, had no impaired judgment or suicidal ideations, and was stable and active in her church, and concluded that these notes could not support the significant limitations marked by Dr. Ruiz in the questionnaire. (Tr. 19-20).

In assessing Dr. Ruiz's opinion, the ALJ failed to properly apply the treating-physician rule. Under that rule, the ALJ should have focused on whether Dr. Ruiz's opinion was consistent with "substantial evidence" in plaintiff's case

record to determine whether or not the opinion was entitled to controlling weight. See 20 C.F.R. § 416.927(d)(2); see also Santiago v. Barnhart, 441 F. Supp. 2d 620, 628-30 (S.D.N.Y. 2006). The record indicates that plaintiff's depression and anxiety make it difficult for her to handle even basic day-to-day activities such as getting out of bed, caring for her children, performing household tasks, and traveling. There is also ample evidence, both medical and non-medical, of plaintiff's forgetfulness, poor concentration, low energy, susceptibility to crying bouts, and panic attacks, all of which could be expected to interfere with her ability to perform even unskilled work on a sustained basis. See Program Policy Statement No. 119 (SSR 85-15), 1985 WL 56857, at *4 (1985). Although the ALJ acknowledged this evidence, much of which is drawn from Dr. Ruiz's treatment notes (see Tr. 86, 124-27, 130, 131), the ALJ appears to have disregarded it in determining that Dr. Ruiz's notes were inconsistent with his opinion as stated in the questionnaire. More significantly, the ALJ appears to have disregarded this evidence in ultimately determining that Dr. Ruiz's opinion was not entitled to controlling weight: rather than discussing Dr. Ruiz's opinion in the context of other evidence in the record as a whole, the ALJ appears to have

analyzed it based on its consistency with only portions of Dr. Ruiz's notes. This is not what the rule requires.[14]

It also appears that the ALJ improperly applied the treating-physician rule in assessing Dr. King's opinion. As mentioned, once the ALJ determined that Dr. Ruiz's opinion would not be accorded controlling weight, he effectively disregarded Dr. Ruiz's findings for those of Dr. King, a consulting physician who met with plaintiff only once. (Tr. 20, 89-90). The ALJ concluded that Dr. King's findings were "more detailed" than those of Dr. Ruiz, and as a result he gave more weight to the consultant's conclusions. (Tr. 20). Specifically, the ALJ noted that Dr. King had found plaintiff to have a "fairly well modulated" affect, a "not significantly depressed or anxious" mood, "coherent and relevant" speech, and no thought disorder, hallucinations, delusions, or suicidal ideations. (Tr. 18). The ALJ also approvingly cited Dr. King's examination findings as evidence that plaintiff possessed adequate attention and concentration, fair judgment, and a satisfactory ability to function in a work setting. (Tr. 18-19).

---

[14] We further note that the ALJ's selective reliance on Dr. Ruiz's notes to support the ALJ's conclusion that plaintiff's condition had become stable (see Tr. 20) undermines any argument that Dr. Ruiz's opinion was "so unreliable that it should not have been assigned controlling weight." Shaw, 221 F.3d at 135.

Affording more weight to Dr. King's findings on the basis that they were "more detailed" was improper under the treating-physician rule. Generally under the rule, consulting physicians' opinions are entitled to only limited weight, while treating physicians' opinions are entitled to greater weight. See, e.g., Santiago, 441 F. Supp. 2d at 629 (noting that the rule "recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing," particularly in the context of mental disabilities, "which by their nature are best diagnosed over time"); Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2000). In disregarding Dr. Ruiz's opinion for Dr. King's on the basis that the latter was more detailed, the ALJ appears to have analyzed the opinions as if they both were initially entitled to the same weight. This was not proper under the treating-physician rule. See, e.g., Gonzalez, 113 F. Supp. 2d at 588-89. In addition, as one court has explained, a treating physician's lack of intermediate data about the limitations caused by a plaintiff's condition is "not surprising" given treating physicians' lack of experience "in the kind of specific vocational evaluations made by the consulting physicians," and hence rejecting an opinion on this basis is inappropriate under both the Commissioner's regulations

and Second Circuit law. See Santiago v. Massanari, 2001 WL
1946240, at *13 (S.D.N.Y. July 16, 2001). Instead, and as
discussed further below,[15] to the extent the ALJ found that Dr.
Ruiz's opinion was insufficiently explained or lacking in
support, the ALJ was bound to seek more information from Dr.
Ruiz. See, e.g., Rivas v. Barnhart, 2005 WL 183139, at *23
(S.D.N.Y. Jan. 27, 2005). Finally, even if the ALJ found Dr.
Ruiz's opinion to be inconsistent with Dr. King's, this would
not permit the ALJ to completely disregard Dr. Ruiz's opinion.
Villanueva v. Barnhart, 2005 WL 22846, at *12 (S.D.N.Y. Jan. 3,
2005).

Upon determining that Dr. Ruiz's opinion was not entitled
to controlling weight, the ALJ also failed properly to apply the
six factors for determining the amount of weight to accord it.
Even assuming arguendo that Dr. Ruiz's opinion had not been
well-supported or was inconsistent with other substantial
evidence in plaintiff's case record, the ALJ would still need to
address the key factors listed in the treating-physician rule to
assign the appropriate weight to Dr. Ruiz's opinion. These
factors include the duration and nature of the treating
relationship, consistency with the record as a whole, and the
expertise of the physician. § 416.927(d). The ALJ's failure to

---

[15] See infra text pp. 35-37.

weigh these factors was legal error. See, e.g., Schaal v. Apfel, 134 F.3d 496, 503-05 (2d Cir. 1998); Villanueva, 2005 WL 22846, at *13.

The Commissioner argues that the ALJ did address these factors, and that the ALJ was in any event only required to give "good reasons" for the weight he ultimately gave to Dr. Ruiz's opinion. While the ALJ acknowledged evidence that would provide information about these factors, there is no indication that the ALJ actually considered such information in assessing the weight to be accorded Dr. Ruiz's opinion. For example, in summarizing the medical evidence, the ALJ mentions various dates on which Dr. Ruiz met with plaintiff, but he never notes the total length of Dr. Ruiz's treatment relationship with plaintiff or uses that information in determining the weight to assign Dr. Ruiz's opinion. The ALJ cites only Dr. Ruiz's supposed "inconsistencies" and the "more detailed examination findings" of Dr. King in deciding to give more weight to Dr. King's opinion. Under the regulations, the latter reason is not relevant to the assignment of weight to Dr. Ruiz's opinion, and the former reason speaks to only one of the six factors (the third factor, supportability). See 20 C.F.R. § 416.927(d)(2)-(6). Thus, since the ALJ's opinion "do[es] not comprehensively set forth reasons for the weight assigned to a treating

physician's opinion," the decision cannot stand. <u>Halloran v.</u> <u>Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004).

In sum, the ALJ misapplied the treating-physician rule and failed to provide "good reasons" for the weight given to Dr. Ruiz's opinion. Since it is far from clear from the record what weight should have been assigned to Dr. Ruiz's opinion or what the disability determination would have been had the correct legal standards been applied, remand is warranted. <u>See</u>, <u>e.g.</u>, <u>Schaal</u>, 134 F.3d at 504-05 (2d Cir. 1998); <u>Villanueva</u>, 2005 WL 22846, at *13.

## 2. <u>Duty to Develop the Record</u>

The ALJ had a duty to affirmatively develop the administrative record. 20 C.F.R. § 416.912(d); <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999). This duty exists even where, as here, the claimant is represented by an attorney. <u>Tejada</u>, 167 F.3d at 774. The Secretary's regulations indicate that the duty to develop the record includes an obligation to clarify any perceived inconsistencies in the report of a treating physician: "We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved . . . ." §

35

416.912(e)(1). Thus, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician before dismissing the opinion. See, e.g., Rosa, 168 F.3d at 79 ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.") (citation omitted); Clark, 143 F.3d at 118; Rivas, 2005 WL 183139, at *23; see generally Schaal, 134 F.3d at 505.

In this case, the ALJ failed to properly develop the record. Although he made "multiple attempts to obtain all possible relevant records" (Tr. 19), it does not appear that he made any attempt to obtain clarification from Dr. Ruiz regarding the perceived inconsistencies between his report and treatment notes. Any attempt to do so would likely have been successful, as plaintiff was able to produce a letter from the physician prior to the determination of the Appeals Council (see Tr. 251), and further information could have potentially resolved any inconsistencies. By determining that Dr. Ruiz's opinions and findings were not entitled to controlling weight without seeking additional clarification or information, the ALJ failed to

36

properly develop the administrative record and thereby committed legal error. See, e.g., Rosa, 168 F.3d at 80; Brown v. Barnhart, 2003 WL 1888727, at *7-9 (S.D.N.Y. Apr. 15, 2003). Accordingly, the case should be remanded, see Schaal, 134 F.3d at 504, and on remand the ALJ should obtain clarification and more detailed findings from Dr. Ruiz. See, e.g., Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000).

 

       B.    The ALJ's Consideration of Plaintiff's
              Other Medical Sources

In support of her application for SSI, plaintiff offered reports from two additional medical sources, Dr. Lillian Carrasco and Ms. Oneida Brown. Plaintiff contends that, in reaching a conclusion that plaintiff was not disabled, the ALJ disregarded the opinions of these sources, who plaintiff contends were treating sources whose opinions were presumptively entitled to controlling weight.

 

       1. Report of Dr. Lillian Carrasco

Dr. Carrasco is the physician who treated plaintiff during her hospitalizations in the Dominican Republic between June and August 2003. (Tr. 138). Plaintiff contends that the ALJ "failed completely to consider" Dr. Carrasco's opinions (Pl.'s Mem. 12),

37

in breach of the requirement that every medical opinion received be evaluated. See 20 C.F.R. § 416.927(d). Plaintiff further asserts that Dr. Carrasco was a treating physician whose opinion was presumptively entitled to controlling weight, and that the ALJ improperly failed to accord her opinion such weight and also failed to apply the six-factor analysis set forth in § 416.927(d) to determine the appropriate weight to assign.

In his decision, the ALJ noted plaintiff's hospitalization, symptoms, and treatment during her visit to the Dominican Republic. (Tr. 18). Plaintiff's contention that the ALJ completely ignored Dr. Carrasco's report therefore is inaccurate. The ALJ also concluded that plaintiff's "medical records indicate that her most serious symptoms had been brought under control" by the time she filed her application in September 2003. (Tr. 20). The evidence in plaintiff's record seems to support this conclusion. While Dr. Carrasco's report states that plaintiff was at risk of suicide (Tr. 141), which appears to be the most serious symptom documented in plaintiff's medical history, there were no indications of suicidal risk or ideation in any of plaintiff's later medical records (see Tr. 84, 89, 127, 130, 131, 132), and no other evidence of such symptoms. Thus, the ALJ was free to conclude that Dr. Carrasco's opinion of plaintiff's suicidal risk was not consistent with

38

other substantial evidence in the record and accordingly not entitled to controlling weight. Veino, 312 F.3d at 588.[16]

As for the other information in Dr. Carrasco's report, it repeats what is noted throughout plaintiff's medical history, namely, that plaintiff suffers from depression, anxiety, and panic attacks. (See Tr. 139-40). The ALJ's determination that plaintiff has a severe major depressive disorder does not conflict with this evidence, and Dr. Carrasco offers no other opinion regarding plaintiff's functional abilities. While it is thus far from clear whether Dr. Carrasco's opinion, if properly weighed, would have altered plaintiff's disability determination, the ALJ did not explicitly discuss his assessment of Dr. Carrasco's report or determine the weight it should be assigned. Even if Dr. Carrasco's opinion was not entitled to controlling weight, it serves as a treating doctor's corroboration of observations made by Dr. Ruiz, and hence it was plainly relevant to plaintiff's status. The ALJ committed legal error by failing to discuss at all the weight the report was entitled to, and on remand, the ALJ should address Dr.

---

[16] We note that even Dr. Carrasco reported that plaintiff was no longer exhibiting suicidal ideation by the time of her discharge in August 2003. (Tr. 140).

Carrasco's report and provide "good reasons" for whatever weight he ultimately accords it. Halloran, 362 F.3d at 32-33.[17]

### 2. Report of Ms. Oneida Brown

Ms. Oneida Brown is a clinical social worker who reports having treated plaintiff from May 2003 until December 2004. (Tr. 150). The ALJ observed that plaintiff had participated in a therapy group led by Ms. Brown (Tr. 18), but made no mention of Ms. Brown's opinion that plaintiff's symptoms had not subsided as of April 2005. (See Tr. 150). Plaintiff asserts that Ms. Brown is a treating medical source whose opinions are presumptively entitled to controlling weight. (Pl.'s Mem. 12-14).

Plaintiff is incorrect in this assertion. A social worker is not an "acceptable medical source" for the purpose of establishing whether plaintiff has a medically determinable

---

[17] The Commissioner's argument that the ALJ did not need to address Dr. Carrasco's findings because they were made before plaintiff's protective filing date is unavailing. The Commissioner cites no case law in support of her contention, and we are unaware of any. The protective filing date is used in calculating a claimant's entitlement to benefits, as opposed to her disability determination. See 20 C.F.R. § 416.330. Moreover, evidence of disability that precedes an application date would seem to offer at least as much support for a plaintiff's disability claim as would similar evidence post-dating the application.

impairment. 20 C.F.R. § 416.913(a). Nonetheless, Ms. Brown's reports constitute evidence that can "play a vital role in the determination of the effects of impairment." Program Policy Statement No. 120 (SSR 85-16), 1985 WL 56855, at *4 (1985).

The SSA concedes that plaintiff has a medically determinable impairment. (Tr. 18, 21; see also Def.'s Mem. 15). What is at issue in this case is whether that impairment prevents Ms. Lopez from "performing unskilled work requiring simple instructions." (Tr. 20). In determining the degree of plaintiff's functional limitations, the ALJ should have considered Ms. Brown's opinion as "other source" evidence. § 416.913(d); White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004) (noting that although a social worker is not an "'acceptable medical source' under the regulations, the ALJ should have considered [plaintiff's social worker's] records as 'other source' evidence") (citations omitted); Marziliano v. Sullivan, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) ("While the opinion of [plaintiff's] social worker does not command the same weight as a physician's, it is nevertheless entitled to some consideration."). Ms. Brown's observations would be relevant on the issue of the intensity and persistence of plaintiff's symptoms, which in turn affect plaintiff's capacity for work and hence the ultimate disability determination. 20 C.F.R. §

41

416.929(c)(3). Although the ALJ is entitled to accord less weight to Ms. Brown's opinion since Ms. Brown is not a treating physician, there is no indication that the ALJ considered Ms. Brown's opinion about plaintiff's symptoms whatsoever. On remand, the ALJ should address Ms. Brown's opinion insofar as it is relevant to the severity of plaintiff's impairment.


C.    The Nature of the Remedy


    For the reasons noted, the decision of the Commissioner cannot stand. The question remains, however, whether the case should be remanded for further consideration or simply for calculation of benefits. As noted, when a remand for further evidentiary proceedings would serve no purpose, the court may reverse and remand solely for the payment of benefits. See, e.g., Parker, 626 F.2d at 235. However, when the administrative record is incomplete or an ALJ has applied an improper legal standard, remand is appropriate. See, e.g., Rosa, 168 F.3d at 82-83.


    The Commissioner argues against remand, contending that the ALJ's decision was supported by substantial evidence. (Def.'s Reply 6-7). Even if we were to agree with that assertion, affirmance would not be justified. Where the ALJ has failed to

apply the correct legal principles in reaching his decision, "application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal, 134 F.3d at 504 (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Remand is warranted unless "application of the correct legal standard could lead to only one conclusion." Id. As discussed, on this record we cannot say with confidence what plaintiff's disability determination would have been had the proper legal standards been applied, and remand is therefore appropriate.

Plaintiff argues that the Commissioner's ruling should be reversed and benefits awarded. Plaintiff asserts that the Commissioner's determination is not supported by substantial evidence, that the evidence shows that she has a listed disability and thus automatically qualifies as disabled, and that a remand for further consideration under the correct legal standards would serve no purpose. (Pl.'s Mem. 18-21). We disagree. As discussed, it is not the function of the courts to determine de novo whether a plaintiff is disabled or to weigh conflicting evidence regarding a plaintiff's disability determination; these remain the province of the SSA. See, e.g.,

Clark, 143 F.3d at 118; Pratts, 94 F.3d at 37. While plaintiff produced evidence of a severe disorder, there is still some question as to the effect of that disorder on her ability to function and work. The record indicates that plaintiff suffers anxiety attacks and symptoms of depression, often remains in bed all day, and has difficulty performing household chores and assisting her children. (Tr. 152-53, 284). Plaintiff's treating physician, Dr. Ruiz, indicated moderate to marked limitations in her ability to perform in a work setting (Tr. 121), and other treatment notes indicate that plaintiff's symptoms of depression and anxiety have been persistent for a period of several years. (Tr. 139-41, 150). However, plaintiff's treatment notes also consistently observed that she was calm and cooperative, able to relate well, and had good concentration and no impaired judgment. (See, e.g., Tr. 67, 69, 70, 73, 84, 86, 89). In addition, there is evidence that plaintiff was not always taking her medication regularly, and it is unclear from the current record what effect her non-compliance may have had on her condition. (See Tr. 131. 132). In sum, while significant, the evidence supporting plaintiff's claim of disability is not so clear as to justify directing an award of benefits.

## CONCLUSION

For the reasons noted, we recommend that the Commissioner's motion be denied and that this case be remanded to the Commissioner for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**DATED: New York, New York**
       **April 24, 2007**

                              RESPECTFULLY SUBMITTED,

                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been
mailed today to:

John J. Tepedino, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

John E. Gura, Jr.
Assistant United States Attorney, S.D.N.Y.
86 Chambers Street, 3rd Floor
New York, NY 10007